IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 00-50750

_____


FORD MOTOR COMPANY, a Delaware Corporation,

              Plaintiff - Appellant,

      v.

TEXAS DEPARTMENT OF TRANSPORTATION, MOTOR VEHICLE DIVISION, ET
AL.,

              Defendants,

BRETT BRAY, individually and as Director, Chief Executive and
Administrative Officer of the Texas Department of Transportation,
Motor Vehicle Division,

              Defendant - Appellee.

      ---------------------------------
      Appeal from the United States District Court
         for the Western District of Texas
      ---------------------------------
              August 27, 2001

Before JONES, DEMOSS and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

     This case involves Ford Motor Company's ("Ford") attempt to

market preowned vehicles in Texas via their internet site known

as The Showroom.  On November 2, 1999, the Texas Motor Vehicle

Division ("the State") filed an administrative complaint against

Ford with the Texas Motor Vehicle Board.  In the complaint, the

State alleged that Ford violated the Texas Motor Vehicle

Commission Code ("the Code"), TEX. REV. CIV. STAT. art. 4413(36),

§§ 4.01, .06(a)(3), (6) & 5.02C(c), as well as TEX. TRANSP. CODE § 503.021, by selling used vehicles to Texas consumers without a dealer's license. Section 4.01(a) of the Code makes it unlawful to "engage in business as, serve in the capacity of, or act as a[n] [automobile] dealer . . . without first obtaining a license."[1] Ford is ineligible under Texas law to receive a license because § 5.02C(c) provides that:

> (c) Except as provided by this section, a manufacturer or distributor may not directly or indirectly:
> (1) own an interest in a dealer or dealership;
> (2) operate or control a dealer or dealership; or
> (3) act in the capacity of a dealer.

In response to the State's administrative complaint, Ford filed suit in federal court alleging that § 5.02C(c) violates Ford's rights under the United States Constitution. Specifically, (1) that § 5.02C(c) facially, or in practical effect, violates the dormant Commerce Clause;[2] (2) that § 5.02C(c), as applied to the Showroom, violates Ford's First Amendment right to free speech; (3) that § 5.02C(c) is unconstitutionally vague; (4) that the State's enforcement of § 5.02C(c) denied Ford equal protection under the law; and (5) that Ford was denied due process in the Enforcement Action brought

---

[1] Unless otherwise indicated, all section numbers refer to those contained in TEX. REV. CIV. STAT. art. 4413(36).

[2] Although there is no *per se* dormant Commerce Clause, we use the term herein to generically refer to the Supreme Court's jurisprudence restricting the rights of the States to discriminate against or burden interstate commerce.

pursuant to § 5.02C(c). The parties filed cross-motions for summary judgment. The district court granted the State's motion for summary judgment as to all of Ford's claims. Ford filed a timely appeal with this Court.

We review grants of summary judgment de novo, guided by the same Rule 56 standard as the district court. Fed.R.Civ.P. 56(c); *Stults v. Conoco, Inc.*, 76 F.3d 651, 654 (5th Cir. 1996). Pursuant to Rule 56, a party may obtain summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). On cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party. *Taylor v. Gregg*, 36 F.3d 453, 455 (5th Cir. 1994). Applying this standard, we find summary judgment appropriate against all of Ford's constitutional claims. Accordingly, the judgment of the district court is AFFIRMED.

### *Facts*

Through the Showroom, located at [www.fordpreowned.com.](www.fordpreowned.com.), customers in Houston, Atlanta, Boston, Washington D.C., New York, and Newark are able to view an on-line selection of preowned Ford

vehicles.  The vehicles available through Ford's website were originally leased by a Ford dealer to a consumer, sold or leased by Ford to national car rental companies, or used as company service vehicles by Ford employees.  Ford does not otherwise obtain used vehicles in order to re-sell them.  Rather, the Showroom is Ford's attempt to create the most profitable market to re-sell these vehicles.  Interested customers, after placing a $300 refundable deposit, may arrange to have a designated vehicle sent to a local dealer in order that they may test-drive it.  Following their test-drive, the customer may then accept or decline to purchase the vehicle at the "no-haggle" price determined by Ford and listed on the website.  Upon payment or financing approval, Ford transfers title to the dealer, who, in turn, transfers title to the customer.

Twenty-two dealers in the Houston metropolitan area joined the program by signing Dealer Participation Agreements.  The Agreement prohibits dealers from selling the selected vehicle at any price other than that set by Ford or charging the customer any handling or documentary fees.  The Agreement also prohibits the dealer from attempting to interest the customer in any of the dealer's inventory until after the customer has declined to purchase the Ford internet vehicle.  These dealers were advised through a letter sent by Carol Kent, the Director of the Texas Department of Transportation, Enforcement Section, of Ford's alleged violation and that their participation in the program

4

constituted aiding and abetting a violation of the Code. They were notified of potential administrative enforcement action if they did not discontinue their participation.

## *Discussion*

Ford argues that § 5.02C(c) of the Code violates the dormant Commerce Clause because it discriminates against of out-of-state interests. Alternatively, Ford contends that § 5.02C(c) unconstitutionally burdens the flow of interstate commerce. The Commerce Clause provides that "[t]he Congress shall have Power . . . [t]o regulate Commerce . . . among the several States." Art. I, § 8, cl. 3. The Constitution thus specifically grants Congress power to regulate interstate commerce. If state regulation conflicts with federal law governing commerce, the Supremacy Clause mandates that the state law be invalidated. In matters not governed by federal legislation, "the Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Systems, Inc. v. Department of Environmental Quality*, 511 U.S. 93, 98, 114 S.Ct. 1345, 1349 (1994).

In reviewing state regulations on interstate commerce under the dormant Commerce Clause, "the first step is to determine whether it 'regulates evenhandedly with only 'incidental' effects

5

on interstate commerce, or discriminates against interstate commerce.'" *Id.* at 99 (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325-26, 99 S.Ct. 1727, 1731 (1979)). A statute discriminates against interstate commerce when it provides for "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Id.* "If a restriction on commerce is discriminatory, it is virtually *per se* invalid." *Oregon Waste Sys.*, 511 U.S. at 99. On the other hand, nondiscriminatory regulations are analyzed under the balancing test established in *Pike v. Bruce Church, Inc.*, whereby the regulation is valid unless "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." 397 U.S. 137, 142, 90 S.Ct. 844, 847 (1970). Because of the wide variation in scrutiny under the respective tests, this initial inquiry is often dispositive of the underlying issue. And while "there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach," this case clearly falls on the *Pike* side of the equation. *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579, 106 S.Ct. 2080, 2084 (1986).

The State's purpose for enacting the Code is set forth in § 1.02, which provides:

The distribution and sale of new motor vehicles in this

6

State vitally affects the general economy of the State and the public interest and welfare of its citizens. It is the policy of this State and the purpose of this Act to exercise the State's police power to insure a sound system of distributing and selling new motor vehicles through licensing and regulating the manufacturers, distributors, and franchised dealers of those vehicles to provide for compliance with manufacturer's warranties, and to prevent frauds, unfair practices, discrimination, impositions, and other abuses of our citizens.

Specifically, with respect to the addition of § 5.02C(c), the legislative history indicates the legislature's intent to prevent manufacturers from utilizing their superior market position to compete against dealers in the retail car market. The legislature's concern was fueled by the recent opening of several dealerships owned by manufacturers and the perceived detriment to the public from vertical integration of the automobile market. Ford argues that this isolation of Texas' retail car market impermissibly discriminates against out-of-state interests and amounts to nothing more than economic protectionism.

Ford would have us interpret *Oregon Waste Sys.*'s basic definition of discrimination – "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter" – to include all instances in which a law, in effect, burdens some out-of-state interest while benefitting some in-state interest. Certainly, a facially neutral statute may be discriminatory because of its effect. *See Minnesota v. Clover Leaf Creamery Company*, 449 U.S. 456, 471 n.15, 101 S.Ct. 715, (1981) ("A court may find a state law

7

constitutes 'economic protectionism' on proof of either discriminatory effect, or of discriminatory purpose." (citations omitted)). However, beyond this point, Ford's expansive interpretation of discrimination is inconsistent with Supreme Court precedent including *Oregon Waste Sys.* itself. The Court's jurisprudence finds discrimination only when a State discriminates among similarly situated in-state and out-of-state interests. Thus, in *Oregon Waste Sys.*, the Court found facially discriminatory an Oregon law that subjected out-of-state *waste* to substantially higher fees than in-state *waste*. This critical distinction is highlighted in the principal cases relied upon by the parties.

The State relies heavily, and justifiably so, on *Exxon Corp. v. Maryland*, 437 U.S. 117, 98 S.Ct. 2207 (1978). We find no significant factual or legal distinction between *Exxon* and the instant case. In *Exxon*, oil companies challenged the validity of a Maryland statute prohibiting producers and refiners of petroleum products from operating retail service stations within Maryland. In the present case, Ford, an automobile manufacturer, challenges the validity of a Texas statute prohibiting manufacturers of automobiles from retailing automobiles within Texas. The oil producers in *Exxon* presented Commerce Clause challenges identical to those raised by Ford. The producers argued that "the Maryland statute violate[d] the Commerce Clause

8

in three ways: (1) by discriminating against interstate commerce; (2) by unduly burdening interstate commerce; and (3) by imposing controls on a commercial activity of such an essentially interstate character that it is not amendable to state regulation." *Exxon*, 437 U.S. at 125. The Court rejected each of these claims. In so doing, the Court made clear that merely because "the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Exxon*, 437 U.S. at 126. Absent a facially discriminatory purpose, a State statute or regulation is discriminatory when it provides for differential treatment of similarly situated entities based upon their contacts with the State or has the effect of providing a competitive advantage to in-state interests vis-a-vis similarly situated out-of-state interests.

Ford's response is to characterize *Exxon* as an anomaly, born solely of the Supreme Court's reaction to the existing gas crisis. In support of this contention, Ford cites *Hunt v. Washington Advertising Comm.*, 432 U.S. 333, 97 S.Ct. 2434 (1977) and *Lewis v. BT Invest. Managers, Inc.*, 447 U.S. 27, 100 S.Ct. 2009 (1980), two cases in which the Court found the contested statutes discriminatory. Far from undermining the holding in *Exxon*, these cases serve to punctuate why its holding controls the outcome of this case.

In *Hunt*, the Washington State Apple Advertising Commission, which is comprised of Washington apple growers and dealers, challenged a North Carolina statute that prohibited containers from bearing any grade other than the applicable U.S. grade or standard. *Hunt*, 432 U.S. at 335. The statute thus prohibited the display of Washington State apple grades which had gained nationwide acceptance among consumers. The Court held that the law at issue was discriminatory because it raised the costs of doing business in the local market, stripped away the economic advantages for an out-of-state participant, and gave advantages to local participants. *Hunt*, 432 U.S. at 350-52. Importantly, the Court evaluated the discriminatory effect of these factors on Washington apples *growers and dealers* as compared to North Carolina apple *growers and dealers*. *Hunt*, 432 U.S. at 351-52. In the same respect, the Court's focus in *Exxon* was on the discriminatory effect between in-state and out-of-state *dealers*, not on discrimination between out-of-state producers and in-state dealers. *Exxon*, 437 U.S. at 125-26. Hence, in analyzing whether § 5.02C(c) is discriminatory under the dormant Commerce Clause we examine its effect on similarly situated business entities.

This critical basis of comparison was the focus of the Court's holding in *Lewis v. BT Invest. Managers, Inc.* At issue in *Lewis* was a Florida Statute prohibiting out-of-state banks, bank holding companies, and trust companies from owning or

10

controlling a business within the State that sells investment advisory services. *Lewis*, 447 U.S. at 31-32. The Florida statute placed no similar restriction on in-state banks, bank holding companies, or trust companies offering investment advisory services. The Court began its analysis of the Florida statute by noting certain similarities between the statutes in *Exxon* and *Lewis*: first, each statute discriminated against vertical organization and second, each statute permitted certain kinds of interstate competitors into the market while prohibiting others. *Lewis*, 447 U.S. at 41. Section 5.02C(c) likewise possesses both of these attributes. The significant point of distinction, and why *Exxon* did not control in *Lewis*, was because:

> Section 659.141(1) engages in an additional form of discrimination that is highly significant for purposes of Commerce Clause analysis. Under the Florida statute, discrimination against affected business organization is *not* evenhanded because only banks, bank holding companies, and trust companies with principal operations *outside* of Florida are prohibited from operating investment subsidiaries or giving investment advice within the State. It follows that § 659.141(1) discriminates *among* affected business entities [banks, bank holding companies, and trust companies] according to the extent of their contacts with the local economy. The absence of a similar discrimination between interstate and local producer-refiners was a most critical factor in *Exxon*.

*Lewis*, 447 U.S. at 42 (emphasis in original).

Ford has failed to show that, either facially or in practical effect, § 5.02C(c) discriminates according to the extent of a business entity's contacts with the State. Section 5.02C(c) does not discriminate based on Ford's contacts with the

11

State, but rather on the basis of Ford's status as an automobile manufacturer. It is irrelevant under § 5.02C(c) whether Ford, as a manufacturer, is domiciled in Texas or Michigan. In either circumstance, it is similarly prohibited from engaging in retail automobile sales in Texas. *See CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 87, 107 S.Ct. 1637 (1987) (upholding a statute because "[i]t has the same effects . . . whether or not the [entity] is a domiciliary or resident of [the State]."). Ford points to the fact that Texas has no motor vehicle manufacturers as evidence of the law's discriminatory purpose and effect. In actuality, under the Code's broad definition of motor vehicle, Texas manufacturers of motorboats and motorcycles are considered motor vehicle manufacturers. *See* § 1.03(25). Irrespective of this fact, the Court rejected a similar assertion in *Exxon*, finding of no consequence that there were no Maryland oil producers or refiners. *Exxon*, 437 U.S. at 125.

Moreover, § 5.02C(c) does not discriminate against independent automobile dealers seeking to operate in Texas. The section only prevents manufacturers, regardless of their domicile, from entering the retail market. Consequently, § 5.02C(c) does not protect dealers from out-of-state competition, it protects dealers from competition from manufacturers. Out-of-state corporations, which are non-manufacturers, have the same opportunity as in-state corporations to obtain a license and

12

operate a dealership in Texas.  Thus, § 5.02C(c) does not discriminate *among* in-state and out-of-state manufacturers, nor does it discriminate *among* in-state and out-of-state dealers by raising the costs of doing business in the local market, stripping away the economic advantages for an out-of-state participant, or giving advantages to local participants.  The absence of such discrimination, either facially or in practical effect, removes § 5.02C(c) from the Supreme Court's definition of a discriminatory law.

The controlling question thus becomes whether, under *Pike v. Bruce Church*, "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." 397 U.S. at 142.  As evidence of the burden on commerce caused by § 5.02C(c), Ford extols the benefits of the Showroom to consumers, Texas automobile dealers, and Ford itself.  The district court correctly ignored these alleged benefits, the elimination of which is not a constitutional burden on commerce. These arguments relate to the economic efficacy of the statute and are misdirected to this Court.  *Exxon*, 437 U.S. at 128 ("It may be true that the consuming public will be injured . . . but . . . that argument relates to the wisdom of the statute, not its burden on commerce.").  Ford has also failed to demonstrate that §5.02C(c) will burden commerce by inhibiting the flow of interstate goods.  The number of out-of-state vehicles retailed

13

in Texas will not decrease because of § 5.02C(c).  Section 5.02C(c) merely requires that automobiles be retailed through independent dealerships, rather than manufacturer-operated dealerships.  *See Exxon*, 437 U.S. at 127 (holding that the Commerce Clause does not protect "the particular structure or methods of operation in a retail market.").  However, even assuming that § 5.02C(c) does create a burden on interstate commerce, Ford has failed to establish that the burden is clearly excessive in relation to the putative local benefits.

Ford initially posits that there are no legitimate state interests to protect, so any burden is clearly excessive.  Ford's argument is without merit.  The State's asserted purposes for passing § 5.02C(c) – to prevent vertically integrated companies from taking advantage of their incongruous market position and "to prevent frauds, unfair practices, discrimination, impositions, and other abuses of our citizens" – are legitimate state interests.  *See Lewis*, 447 U.S. at 43 ("Discouraging economic concentrations and protecting the citizenry against fraud are undoubtedly legitimate state interests.").

Ford next argues that even if the State's interests are legitimate, § 5.02C(c) does not further these interests.  In this regard, Ford's most compelling argument is that it does not

14

occupy a superior position in the preowned vehicle marketplace.[3]

Consistent with the use of the term "putative" in the *Pike*

balancing, this Court will not "second guess the empirical

judgment of lawmakers concerning the utility of legislation."

*CTS Corp.*, 481 U.S. at 92.  As Justice Brennan explained in his

concurring opinion in *Kassel v. Consolidated Freightways Corp.*:

> In determining those benefits, a court should focus
> ultimately on the regulatory purposes identified by the
> lawmakers and on the evidence before or available to them
> that might have supported their judgment.  Since the court
> must confine its analysis to the purposes the lawmakers had
> for maintaining the regulation, the only relevant evidence
> concerns whether the lawmakers could rationally have
> believed that the challenged regulation would foster those
> purposes.  It is not the function of the court to decide
> whether *in fact* the regulation promotes its intended
> purpose, so long as an examination of the evidence before or
> available to the lawmaker indicates that the regulation is
> not wholly irrational in light of its purposes.

450 U.S. 662, 680-81, 101 S.Ct. 1309 (citations omitted)

(emphasis in original).  Irrespective of Ford's or this Court's

view of the law's potential effect, there is certainly evidence

from which a reasonable legislator could believe § 5.02C(c) would

further the State's legitimate interest in preventing

manufacturers from utilizing their superior market position to

---

[3] Ford also argues that it is not competing against independent dealers through the Showroom.  Such a contention is without merit.  Ford seeks to have consumers purchase a vehicle directly from Ford through its internet site rather than purchasing a vehicle from the inventory on the dealer's lot.  In addition to this obvious competition, the price Ford sets for its Showroom vehicles will certainly effect the price of preowned vehicles sold by independent dealers.

compete against dealers.[4]

Ford obtains a large volume of preowned vehicles that were originally leased by a Ford dealer to a consumer, sold or leased by Ford to national car rental companies, or used as company service vehicles by Ford employees. These are not "used" vehicles in the sense that they have been previously retailed to a consumer.[5] The vehicles are relatively new, Ford and Lincoln-Mercury vehicles to which Ford never relinquished title. Previously, Ford sold these vehicles through closed auctions to its dealers. Ford now selects some of these vehicles and, through the Showroom, retails the vehicles itself.[6] With respect

---

[4] As background on the relationship between automobile manufacturers and dealers, at least as it existed in the late 1970's, see excerpts from a congressional committee report cited by the Supreme Court in *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 439 U.S. 96, 100 n.4 99 S.Ct. 403 (1978).

[5] It appears that nothing in the Code would prohibit Ford from selling such "used" vehicles to consumers. The Code only prohibits a manufacturer from selling "new motor vehicles" – motor vehicles which have not been the subject of a prior retail sale. *See* § 103(15) and (26).

[6] Pervading Ford's constitutional challenges is its insistence that it is not technically selling automobiles to consumers since it transfers title to the dealer who, in turn, transfers title to the consumer. Regardless of the merit of this argument, it is not relevant to Ford's constitutional claims. It relates to Ford's alleged violation of § 5.02C(c), a question not before this Court and appropriately left to the administrative law judge by the district court. In its brief, Ford states that "[t]he district court concluded that, because Ford 'sold' Showroom Vehicles directly to consumers, Ford was 'acting in the capacity of a dealer' in violation of § 5.02C(c)(3)." On the contrary, the district court expressly declined "to determine whether Ford's conduct violate[d] the Code as this determination is best made by

16

to these vehicles, Ford seems to remain in a superior market position to its dealers.  At least, the evidence is not so one-sided as to lead this Court to believe that the proffered state interests are an excuse to discriminate against or burden interstate commerce for the benefit of local industry.  Ford has thus failed to carry its burden of proving that "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."

Finally, Ford asserts, as did the oil producers in *Exxon*, that the need for nationwide uniformity outweighs the State's interests in regulating.  Here, Ford does not rely on the nationwide market for the automobile, but instead on the role of the internet and so-called e-commerce.  For this proposition, it cites *American Libraries Assoc. v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997).  The challenged statute in *Pataki* sought to prohibit the knowing dissemination, via the internet, of sexual depictions or communications to a minor.  *Id.* at 963.  One of the bases on which the district court ruled the Act unconstitutional

---

the administrative law judge."  *Ford Motor Co. v. Texas Dept. of Trans.*, 106 F.2d Supp. 905, 913-14 (W.D. Tex. 2000).  At the time the briefs were filed in this case, the administrative law judge had submitted her Proposal for Decision to the Motor Vehicles Board.  The ruling is a recommendation to the Board, which then renders a final decision.  A party is entitled to judicial review of any final board action in a District Court of Travis County, Texas.  *See* Section 7.01(a).  Any ruling by this Court on whether Ford violated the Code would improperly preempt established administrative procedures.

17

was that the internet falls among those types of commerce that "demand consistent treatment and are therefore susceptible to regulation only on a national level." *Id.* at 181. When considering laws that directly regulate internet activities, this alleged need for uniformity may well prevail. However, application of this principle in circumstances like the instant case would lead to absurd results. It would allow corporations or individuals to circumvent otherwise constitutional state laws and regulations simply by connecting the transaction to the internet. Section 5.02C(c) serves as a prohibition on all forms of marketing and sales by manufacturers, not just those conducted via the internet. In the absence of Congressional legislation, § 5.02C(c)'s incidental regulation of internet activities does not violate the Commerce Clause.

Ford's second challenge is that § 5.02C(c), as applied to the Showroom, violates its First Amendment right to speech. The advertising and information on Ford's website constitutes commercial speech. "The First Amendment, as applied to the States through the Fourteenth Amendment, protects commercial speech from unwarranted governmental regulation." *Central Hudson Gas & Elec. Corp. v. Public Service Comm. of New York*, 447 U.S. 557, 561 100 S.Ct. 2343, 2349 (1980) (citing *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 761-

62, 96 S.Ct. 1817, 1825 (1976)).  Commercial speech is, however,

afforded lesser protection under the Constitution than other

forms of expression.  *See Florida Bar v. Went For It, Inc.*, 515

U.S. 618, 623, 115 S.Ct. 2371, 2375 (1995) ("Commercial speech

enjoys a limited measure of protection, commensurate with its

subordinate position in the scale of First Amendment values, and

is subject to modes of regulation that might be impermissible in

the realm of noncommercial expression.").  This Court analyzes

commercial speech cases under *Central Hudson*'s four-part

framework:

> At the outset, we must determine whether the expression is
> protected by the First Amendment.  For commercial speech to
> come within that provision, it at least must concern lawful
> activity and not be misleading.  Next, we ask whether the
> asserted governmental interest is substantial.  If both
> inquiries yield positive answers, we must determine whether
> the regulation directly advances the governmental interest
> asserted, and whether it is not more extensive than is
> necessary to serve that interest.

*Dunagin v. City of Oxford, Miss.*, 718 F.2d 738, 746-47 (5th Cir.

1983) (en banc) (quoting *Central Hudson*, 447 U.S. at 566).  The

first step is thus to determine whether the speech involved in

this case concerns a lawful activity.  The State does not contest

that the information on Ford's website is truthful and not

misleading.

Ford argues that in order for the commercial speech to be

unlawful, it must be inherently unlawful or otherwise prohibited

by some law independent from § 5.02C(c).  Specifically, Ford

19

reasons that "[t]he proper analysis under *Central Hudson*'s first prong is to determine whether some valid law, besides the challenged law, made the speech unlawful. If this were not true, then the challenged state law would always trump the First Amendment because one's speech would always be 'unlawful' under the challenged law." While superficially appealing, the flaw in Ford's logic becomes apparent upon consideration of its underlying assumptions and established Supreme Court precedent.

Section 5.02C(c) prohibits manufacturers from retailing motor vehicles to consumers. An accompanying result of this prohibition is that Ford is not allowed to advertise the sale of motor vehicles to consumers. The Supreme Court has made clear that "[a]ny First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376, 389, 93 S.Ct. 2553, 2561 (1973). In the present case, the restriction on Ford's ability to advertise on their website is only incidental to § 5.02C(c)'s prohibition on Ford's right to engage in the economic activity of retailing

20

automobiles.[7]  In contrast, if § 5.02C(c) prohibited advertising

the sale of motor vehicles by licensed dealers, a commercial

activity lawful in Texas, the regulation would invoke the

protections of the First Amendment and be subjected to the

intermediate scrutiny outlined in *Hudson*.

Typically, when an individual or corporation challenges an

economic regulation under the Due Process or Equal Protection

Clause, a State has the minimal burden of showing that the law

has a rational basis.  Under Ford's reasoning, a petitioner could

bootstrap themselves into the heightened scrutiny of the First

Amendment simply by infusing the prohibited conduct with some

---

[7] In this case, Ford is not really challenging the prohibition on advertising through its website, it is challenging its ability to retail automobiles in Texas.  Therefore, it is Ford's burden to prove that § 5.02C(c) is not a valid limitation on economic activity; it is not the State's burden to show another law under which the economic activity is prohibited. *See Pittsburgh Press*, 413 U.S. at 388 ("Discrimination in employment is not only a commercial activity, it is illegal commercial activity *under the Ordinance*.") (emphasis added).  The federal district court for the Southern District of Texas expounded this principle in response to a similar First Amendment challenge to § 5.03 of the Code – Texas' Anti-Brokering Statute.  The district court explained that "[t]he statute is aimed at regulating the business of brokering, not the speech of brokers.  The statute does not proscribe what a broker may or may not say – it makes the business of brokering unlawful, and thus makes *any* conduct or speech made in furtherance of brokering unlawful. . . . If the State may constitutionally prohibit an activity, it may also prohibit commercial speech relating to that activity.  In the instant case, if the State's regulation of new vehicle brokering is otherwise constitutional, then the resulting restriction on commercial speech of those not permitted to broker new vehicles will not render the same statute unconstitutional." *Automaxx, Inc. v. Morales*, 906 F.Supp. 394, 402 & n.6 (S.D. Tex. 1995).

21

element of speech.  Petitioners in *Giboney v. Empire Storage &*
*Ice Co.*, 336 U.S. 490, 69 S.Ct. 684 (1949), attempted to lead the
Supreme Court down the same erroneous path suggested by Ford.  In
*Giboney*, the petitioners were Union members who sought to picket
outside of their employer's place of business.  *Id.* at 492.
Their picketing was in protest of a company agreement to purchase
ice from non-union peddlers.  *Id.*  A state court enjoined the
picketers pursuant to Missouri law, which prevented unreasonable
interferences with trade.  *Id.* at 493.  After concluding that the
challenged State law was within the power of the State, the
Supreme Court rejected the picketers' contention that the
injunction was an unconstitutional abridgement of free speech
because they were only disseminating truthful facts.  *Id.*  The
Court found that the speech was part of an integrated course of
conduct "which was in violation of Missouri's valid law."  *Id.*
Furthermore, that "it has never been deemed an abridgement of
freedom of speech or press to make a course of conduct illegal
merely because the conduct was in part initiated, evidenced, or
carried out by means of language, either spoken, written, or
printed. . . . Such an expansive interpretation of the
constitutional guaranties of speech and press would make it
practically impossible ever to enforce laws against agreements in
restraint of trade as well as many other agreements and
conspiracies deemed injurious to society."  *Id.* at 502; *see also*

22

*Ohralik v. Ohio State Bar Assoc.*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918 (1978).

The Court's reasoning in *Giboney* applies to Ford's advertisement, via the internet, of preowned motor vehicles. That advertisement, while of truthful facts, is part of an integrated course of conduct which violates Texas law – retailing motor vehicles without a license. Ford's speech does not concern a lawful activity and any restriction on Ford's commercial speech is only incidental to the State's prohibition on Ford's ability to retail motor vehicles. Thus, we need not progress further in the *Central Hudson* analysis in order to reject Ford's First Amendment claim.

Section 5.02C(c) provides that a manufacturer may not directly or indirectly, operate or control a dealer or act in the capacity of a dealer. In its administrative complaint, the State alleged that Ford, through the operation of the Showroom, acted in the capacity of a dealer. Ford counters that § 5.02C(c) is unconstitutionally vague and does not provide it fair notice of what conduct constitutes "operating or controlling a dealer" or "acting in the capacity of a dealer." In this regard, Ford correctly notes that neither of these phrases are defined in the Code. The term "dealer" is, however. Additionally, during her deposition, Carol Kent, the Director of the Texas Department of

23

Transportation, Enforcement Section, indicated that if a company had any questions regarding whether their conduct violated the Code, they could contact the Motor Vehicle Division. Ford attacks this position as unreasonable.

Under this Court's precedent, the appropriate test for a vagueness challenge depends on whether the statute at issue is civil or criminal. For criminal statutes "[w]e employ the two-part void-for-vagueness test described in *City of Chicago v. Morales*":

> Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement.

*United States v. Escalante*, 239 F.3d 678, 680 (5th Cir. 2001) (quoting 527 U.S. at 56). A less stringent standard is applied to civil statutes that regulate economic activity. *See Village of Hoffman Estates v. Flipside Hoffman Estates, Inc.*, 455 U.S. 489, 495, 102 S.Ct. 1186, 1191 (1982) ("[E]conomic regulation is subject to a less strict vagueness test"). An economic regulation is invalidated "only if it commands compliance in terms 'so vague and indefinite as really to be no rule or standard at all' . . . or if it is 'substantially incomprehensible.'" *United States v. Clinical Leasing Services, Inc.*, 925 F.2d 120, 122 n.2 (5th Cir. 1991) (quoting *A.B. Small Co. v. American Sugar Refining Co.*, 267 U.S. 233, 239 (1925) and

24

*Exxon Corp. v. Busbee*, 644 F.2d 1030, 1033 (5th Cir. 1981)). There is, however, a caveat to this general rule. Civil statutes or regulations that contain quasi-criminal penalties may be subject to the more stringent review afforded criminal statutes.

The Supreme Court applied the more stringent standard in reviewing an ordinance that required stores to obtain a license to sell "any items, effect, paraphernalia, accessory or thing which is designed or marketed for use with illegal cannabis or drugs . . . ." *Hoffman*, 455 U.S. at 500. Customers that purchased such goods were forced to sign their names and addresses to a register that would be available to police. *Id.* at 500 n.16. The Court concluded that, while the statute nominally imposed civil penalties, its prohibitory and stigmatizing effect warranted quasi-criminal treatment. *Id.* at 489.

In *United States v. Clinical Leasing Service, Inc.*, 925 F.2d 120, 122 (5th Cir. 1991), this Court reviewed a federal statute prescribing civil penalties for "[a]ny party who distributes or authorizes the distribution of controlled substances without adequate registration." Although the statute authorized civil penalties, this Court determined that "its prohibitory effect is quasi-criminal and warrants a relatively strict test." *Id.* As such, the statute was required to define the offense "'with sufficient definiteness that ordinary people can understand what

25

conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Id.* (citing *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858 (1983)). Similarly, this Court found that where a statute permits "potentially significant civil and administrative penalties, including fines and license revocation," quasi-criminal treatment is appropriate and thus the more strict standard of review applies. *Woman's Medical Center of Northwest Houston v. Bell*, 2001 WL 370053 (5th Cir. 2001). In the present case, the Code only provides for civil monetary damages in the event of a violation. And while the potential fines are substantial,[8] no prohibitory effect or quasi-criminal penalties are associated with a violation of the Code. Thus, Ford must show that § 5.02C(c) is vague, "not in the sense that it requires a person to conform to an imprecise, but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Ferguson v.* Estelle, 718 F.2d 730, 735 (5th Cir. 1983) (quoting *Coates v. Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686 (1971)).

The Motor Vehicle Code provides that for purposes of § 5.02 "dealer" means "franchised dealer." Therefore, in deciding whether § 5.02C(c) provides a comprehensible standard for "acting

---

[8] Indeed, the administrative law judge submitted her Proposal for Decision to the Motor Vehicles Board recommending a civil penalty of approximately $ 1.7 million.

26

in the capacity of a dealer," this Court must first look to the definition of a franchised dealer. A franchised dealer is "any person . . . who is engaged in the business of buying, selling, or exchanging new motor vehicles and servicing or repairing motor vehicles . . . ."[9] Section 1.03(15). A new motor vehicle means "a motor vehicle which has not been the subject of a 'retail sale' without regard to the mileage of the vehicle." Section 1.03(26). A retail sale means "the sale of a motor vehicle except a sale in which the purchaser acquires a vehicle for the purpose of resale." Section 1.03(32). Ford argues that, based on the definitions in § 1.03, it did not technically engage in a retail sale because it sold the automobile to the dealer who then sold it to the customer. Because the purchaser, the dealer, purchased the vehicle for the purpose of resale, the transaction is excepted from the definition of a retail sale. Or, in any event, they could not know if such an arrangement was prohibited by § 5.02C(c).

Ford essentially argues that § 5.02C(c) is vague because

_____

[9] The full text of § 1.03(15) provides:

"Franchised dealer" means any person who holds a franchised motor vehicle dealer's general distinguishing number issued by the Department pursuant to the terms of Chapter 503, Transportation Code, and who is engaged in the business of buying, selling, or exchanging new motor vehicles and servicing or repairing motor vehicles pursuant to the terms of a franchise and a manufacturer's warranty at an established and permanent place of business pursuant to a franchise in effect with a manufacturer or distributor.

Ford was unsure whether its operation of the Showroom constituted acting the capacity of a dealer. Ford's argument misapprehends the basic purpose behind prohibiting vague statutes. Vague statutes violate due process, because laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298 (1972). Ford knew, that as a manufacturer, it was prohibited from selling automobiles and it had fair notice that its conduct may violate § 5.02C(c).[10] In drafting § 5.02C(c), the legislature probably intended, permissibly so, to capture whatever creative conduct could be imagined by manufacturers to circumvent the statute's intended prohibition. A statute is not unconstitutionally vague merely because a company or an individual can raise uncertainty about its application to the facts of their case. A statute is unconstitutionally vague "only where no standard of conduct is

---

[10] A brief review of the Showroom's operation makes clear that Ford's activities implicate the prohibition on a manufacturer acting in the capacity of a dealer. Ford directly operates the Showroom through its website www.fordpreowned.com. Ford owns title to the vehicles displayed on the site; controls which vehicles are displayed on the site; controls what information is presented about the vehicles; and sets the "no-haggle" price for each vehicle. Consumers select a vehicle from the site and, for a $300 refundable deposit, Ford delivers the vehicle to a local dealer for a test drive. After the test drive, the consumer decides whether or not to purchase the vehicle. Until the consumer clearly rejects the Ford internet vehicle, the dealer cannot offer the consumer a vehicle from the dealer's inventory. If the consumer decides to purchase the Ford internet vehicle, Ford transfers title to the dealer, who then transfers title to the consumer.

28

outlined at all; when no core of prohibited activity is defined."
*Margaret S. v. Edwards*, 794 F.2d 994, 997 (5th Cir. 1986).

The level of precision a statute must contain depends, in part, upon the nature of the enactment. *Clinical Leasing*, 925 F.2d at 122. Broader proscriptions are permitted in economic regulations because "businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Id.* at 498. By making an inquiry in this case, Ford could have obtained a pre-enforcement ruling on whether the Showroom complied with Texas law. In fact, negotiations between the State and General Motors allowed GM to become involved in running a website in compliance with Texas law. Even absent an administrative procedure, § 5.02C(c) is not unconstitutionally vague. Section 5.02C(c) provides a comprehensible standard of the proscribed conduct – acting in the capacity of a dealer. The phrase "in the capacity of a dealer" is naturally read to include those activities performed by a licensed dealer. The Code defines exactly what activities are performed by a dealer – buying, selling, or exchanging motor vehicles. *See Escalante*, 239 F.3d at 680 (upholding a Mississippi statute prohibiting careless and imprudent driving). Thus, it is clear under §

5.02C(c) what conduct is proscribed. Accordingly, Ford's argument that § 5.02C(c) is unconstitutionally vague fails.

The Equal Protection Clause commands that no person shall be denied equal protection of the law by any State. U.S. CONST. amend. XIV, § 1. Ford alleges it was denied equal protection in two respects: first, the State had no rational basis for classifying manufacturers different than dealers; and second, that no rational basis exists to justify differential treatment between Ford's Showroom and a similar website program named GM DriverSite.

The equal protection guarantee applies to all government actions which classify individuals for different benefits or burdens under the law. *See Labar v. Bennett*, 365 F.2d 698, 723 (5th Cir. 1966) ("The equal protection clause prohibits a state from making arbitrary and unreasonable classifications."). "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 2101 (1993). Ford argues that there is no rational basis for classifying manufacturers differently than

dealers because manufacturers do not have disproportionate power in the preowned vehicle market.  For the reasons discussed in the dormant Commerce Clause analysis, we "have no hesitancy in concluding that [§ 5.02C(c)] bears a reasonable relationship to the State's legitimate purpose in controlling the [automobile] retail market . . . ."  *Exxon*, 437 U.S. at 125.

Ford's second claim is that the State violated the Equal Protection Clause because it did not have a rational basis for treating Ford differently than General Motors.  "[T]he Equal Protection Clause essentially directs that all persons similarly situated be treated alike."  *Wheeler v. Miller,* 168 F.3d 241, 252 (5th Cir. 1999).  Thus, "[i]t is clearly established that a state violates the equal protection clause when it treats one set of persons differently from others who are similarly situated."[11] *Yates v. Stalder*, 217 F.3d 332, 334 (5th Cir. 2000).

General Motors and Ford are both manufacturers and should be similarly prohibited from entering the retail automobile market.  Nothing in this case indicates that differing restrictions have been placed on the two companies.  Ford argues that the State has treated General Motors differently by allowing them to operate a website retailing automobiles.  Despite Ford's attempt to

---

[11]  It is questionable, here, whether Ford's claim even amounts to the sort of discrimination prohibited by the Equal Protection Clause.  However, the Supreme Court has recognized that even a "class of one" can present a challenge to discriminatory treatment. *Village of Willowbrook v. Olech*, 120 S.Ct. 1073, 1074 (2000).

characterize the GM website as a mirror image of their own, there are significant differences. First, General Motors contracted with a third party, DeMontrond, to operate the website.[12] DeMontrond is an independent dealer licensed to sell automobiles in Texas. DeMontrond, unlike Ford's situation, immediately receives title to the automobile for sale on the website. If the automobile is not sold, DeMontrond, not GM, is responsible for finding an alternative means of selling the car. DeMontrond's internet price for the vehicle is established through the use of a mutually developed pricing schedule. Ford, on the other hand, has sole discretion to set the price for its vehicle. A price which may influence the price of other preowned vehicles being sold throughout the State. While there are certainly similarities between the two websites, the differences between them are significant enough to justify the State's position. Ford has not shown any restriction placed upon their involvement in the retail market that has not similarly been placed on GM. Notably, there is no evidence that the State would not allow Ford to maintain a website through similar ties to a third party dealer. Ford's equal protection challenge thus fails.

Due process requires "a fair trial in a fair tribunal." *In*

---

[12] GM apparently owns the hardware and software used to run the site.

*re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625 (1955).  This fundamental right applies equally to proceedings before an administrative agency.  *Gibson v. Berryhill*, 411 U.S. 564, 569, 93 S.Ct. 1689, 1693 (1973).  Ford's final claim is that it was denied due process during its enforcement hearing.  First, because the outcome was predetermined and second, because Brett Bray has an inherent conflict of interest in serving in his several capacities within the Motor Vehicle Division.

Ford's first claim that the outcome of the hearing was predetermined is baseless.  Carol Kent, the Director of the Texas Department of Transportation, Enforcement Section, sent out a letter advising dealerships that their participation in the Showroom program violated state law.  Perhaps improperly, the letter stated that Ford was in violation of the Code, a conclusion which should properly be left to the Board.  Brett Bray apparently "acquiesced" in this letter being sent out.  Because the letter definitively stated that Ford was in violation of the Code, Ford contends that the outcome of the Enforcement Action was predetermined before its hearing.  Ford's position ignores the fact that the letter carries no weight in the later proceedings nor does Kent's opinion that the Code was violated.  Even Bray's apparent acquiescence in the letter, and the opinion stated therein, has no binding effect in the hearing before the administrative law judge or the Board.  Finally, as a general

33

matter, the pre-hearing opinion of an enforcement agent that a defendant violated the law does not rise to the level of a procedural due process violation.

In his position as Director of the Motor Vehicle Division, Bray administers both Kent, who brought the Enforcement Action, and the administrative law judge who presided over it. Ford alleges that by serving in these multiple roles, Bray can improperly influence the individuals involved and that the mere possibility of impropriety inherent in this structure means it cannot obtain a fair hearing. The Supreme Court has identified several types of decision makers in which the mere probability of bias renders them constitutionally unacceptable: (1) where the decision maker has a pecuniary interest in the outcome of the case; and (2) where an adjudicator has been the target of personal abuse or criticism from the party before him. *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 1464 (5th Cir. 1975). A third class of decision makers, the one at issue in the instant case, are those that exercise both investigative and adjudicative responsibilities. *Id.* With respect to this third class, "[t]he movant must overcome two strong presumptions: (1) the presumption of honesty and integrity of the adjudicators; and (2) the presumption that those making decisions affecting the public are doing so in the public interest." *Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1052-1053 (5th Cir. 1997); *see also*

34

*Withrow*, 421 U.S. at 55 ("Without a showing to the contrary, state administrators 'are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.'" (quoting *United States v. Morgan*, 313 U.S. 409, 421, 61 S.Ct. 999, 1004 (1941))).  Even assuming that the administrative structure of the Motor Vehicle Division places Bray in a position to function both as an investigator and an adjudicator, Ford has not offered any proof to overcome the presumption of fairness. Without evidence of Bray's improper influence, Ford's due process challenge fails.

Having reviewed and rejected Ford's attacks on the judgment of the district court, the same is AFFIRMED.

EDITH H. JONES, specially concurring:

I concur in Judge Benavides's conscientious opinion, but as to the negative commerce clause analysis, I do so only because Exxon Corp. v. Maryland, 437 U.S. 117, 98 S.Ct. 2201 (1978), compels this result. The Exxon case found no discrimination against interstate commerce where a state statute prohibited competition with local gasoline retailers by out-of-state companies at another level of product distribution (refiners). Exxon seems woefully out of step with the Court's more recent cases. See, e.g., West Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 114 S.Ct. 2205 (1994). Texas's outright prohibition on retail competition from out-of-state auto manufacturers is about as negative toward interstate commerce as legislative action can get. If, as the Court says, its negative commerce clause jurisprudence intends to prevent "economic protectionism" of local businesses, 114 S.Ct. at 2217, and to stop states from imposing higher (in this case prohibitive) costs on products from out-of-state sources, 114 S.Ct. at 2213-14, then Ford's dealer-cooperative, consumer-friendly program ought not be stymied by parochial state legislation. It should be obvious that the flow of interstate goods is diminished when barriers to entry totally prevent fair competition by a class of potential distributors: the favored local distributors' price and service incentives become less keenly competitive, prices rise, and overall sales will decline from the free-market equilibrium point. Since this Texas statute appears to

36

reflect a genre of state laws favoring local automobile dealers over out-of-state manufacturers, perhaps the Supreme Court will give us further guidance.