# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 29, 2010

No. 09-10476

Lyle W. Cayce
Clerk

EMPLOYERS MUTUAL CASUALTY COMPANY; EMCASCO INSURANCE COMPANY,

> Plaintiffs – Appellees

v.

JUAN MIGUEL BONILLA, also known as Mike; ISABEL MOLINA, Individually, and as next friend of J.Y.L.M., a minor,

> Defendants – Appellants

Appeal from the United States District Court
for the Northern District of Texas

Before DAVIS, WIENER, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

This is an insurance coverage dispute. It arose after a state court judgment established liability for a serious accident. The district court granted a Motion for Summary Judgment in favor of the insurance companies, finding there to be no coverage. We hold that the district court erred in denying coverage based on the argument that the injury did not arise from "use" of the vehicle. Another exclusion under the relevant policies remains to be considered, however, that was not addressed because of the district court's initial ruling. We REVERSE and REMAND for further proceedings.

No. 09-10476

## I. FACTS

Juan Miguel Bonilla leased Truck 219, a mobile catering truck, from Jolly Chef Express, Inc., in Dallas, Texas. He also leased a space on Jolly Chef's commissary and parking lot. Daily, Bonilla hired a driver and cook for each of his trucks. At the end of each day the driver and cook would return to the commissary to clean the truck and prepare for the next day's route.

On February 13, 2002, Bonilla hired Fabricio Fernandez to drive and Isabel Molina to serve as a cook on Truck 219. Molina and Fernandez completed their route and returned Truck 219 to Jolly Chef's lot. While Truck 219 was parked, Fernandez poured a flammable substance, likely gasoline, on the floor of the truck to loosen the grease. Fernandez then left the truck in order to turn in the money they had earned for the day. As Molina began washing the dishes and trays for the day, she heard an explosion and was suddenly in flames. A pilot light from the stove had ignited the substance that Fernandez had poured on the floor. Molina was severely injured.

Molina sued Bonilla and Jolly Chef in Texas state court. Bonilla did not have insurance of his own. Truck 219 was listed, though, on Jolly Chef's three insurance policies. Jolly Chef's trucks were insured by Employers Mutual Casualty Company under a Commercial General Liability ("CGL") Policy and a Commercial Umbrella Policy. Jolly Chef had also purchased a Commercial Auto Liability Policy from Emcasco Insurance Company. The Auto Policy covered all of Jolly Chef's trucks. Emcasco and Employers Mutual are jointly represented. They will be referred to as EMC except where a distinction is needed.

EMC defended both Jolly Chef and Bonilla under a reservation of rights. Molina won a judgment against Bonilla in the amount of $1,832,933.58. Molina took nothing against Jolly Chef.

EMC filed the present declaratory judgment action in the United States District Court for the Northern District of Texas. Both Bonilla and Molina were

2

No. 09-10476

named as defendants, and they are separately represented. EMC denied any liability under any policy for the claims asserted in the state court suit.

In due course, each of the parties filed motions for summary judgment. The district court granted EMC's motion, finding no coverage under any of the policies. (1) There was no coverage under the CGL policy because neither Bonilla nor Molina was an "insured." No issues are raised on appeal about the CGL Policy. (2) There was no coverage under the Auto Policy because the fire did not arise out of the "use" of the vehicle as a vehicle or the maintenance of it. (3) There was no coverage under the Umbrella Policy because the meaning of "use" in that policy was the same as under the Auto Policy.

Bonilla and Molina appealed.

## II. DISCUSSION

We review each of the rulings on cross-motions for summary judgment *de novo*. *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001); Fed. R. Civ. Pro. 56(c)(2). We independently examine the evidence and inferences from the perspective favoring the non-moving party, in order to determine if there are any disputes of material fact. *Id.*

The district court concluded that none of the three policies purchased by Jolly Chef provided coverage for Molina's claims. We start our analysis with a description of each of these policies.

*A. Overview of the Policies*

Jolly Chef purchased an Auto Policy, a CGL Policy, and an Umbrella Policy. The Umbrella Policy gave coverage "arising out of the ownership, maintenance, operation, use (including loading or unloading), or entrustment to others" of an automobile, if there was coverage provided under a primary policy. "The coverage provided by this policy will not be broader than the coverage provided by the 'primary' insurance policy." Therefore, the Umbrella Policy supplemented the liability limits of the Auto Policy. The Umbrella Policy also

provided coverage in the absence of coverage under a primary policy provided one was using the vehicle with the permission of a named insured. The reach of this additional coverage is contested, a contest we need not resolve.

Under the Auto Policy, the insurer "will pay all sums an insured legally must pay as damages because of bodily injury or property damage to which this insurance applies, caused by an accident and resulting from the ownership, maintenance or use of a covered auto."

The CGL Policy covered "bodily injury" and "property damage" arising from "occurrences" (defined as "accidents") taking place in the "coverage territory." The CGL Policy synchronized with the Auto Policy by excluding coverage for bodily injury and property damage "arising out of the ownership, maintenance, use or entrustment to others of any . . . auto . . . owned or operated by or rented or loaned to any insured." There may have been additional exclusions under the CGL Policy, but the general manner in which the two policies dovetailed is clear.

We look to Texas law to determine the effect that the existence of multiple policies might have on our issues. In the principal case cited to us by both parties, the Texas Supreme Court relied extensively on two treatises. *See Mid-Century Ins. Co. of Tex. v. Lindsey*, 997 S.W.2d 153, 156 (Tex. 1999). One of the treatises embraced by the court, in a section not quoted, explained the interplay of two insurance policies that use the phrase "arising out of ownership, maintenance, or use" of a motor vehicle:

> The term "arising out of the operation, maintenance, or use" of a vehicle typically arises in two distinct contexts: first, in the context of an inclusory provision as to coverage in an automobile liability policy; and second, in connection with an exclusionary provision in general liability or homeowners' insurance policies. In keeping with the general rules of construction, the term may be construed differently in each context, as the coverage provision is

4

> generally entitled to liberal construction in favor of coverage, while the exclusion is subject to a narrow construction against the insurer.

8A COUCH ON INSURANCE § 119:26 (3d ed. 2009) (footnotes omitted) [hereinafter COUCH].

The author states that both the language of exclusion and of inclusion should be read to favor coverage. We interpret that language in light of the Texas Supreme Court's identification of what it calls the fundamental point, namely, to determine "what coverage is intended to be provided by insurers and acquired and shared by premium-payers." *Lindsey*, 997 S.W.2d at 158. Jolly Chef's intent is relevant, along with that of the insurers, in determining the reasons for the use of different policies.

The CGL Policy that Jolly Chef purchased was found not to apply because Bonilla was not an "insured." That decision is not challenged on appeal. Though coverage by the CGL Policy is not an issue, the policy itself is relevant. Had an insured under both the CGL and the Auto Policy been the claimant (Jolly Chef, for example), the dispute would have had a much different form. If the Auto Policy did not cover the occurrence because the injury did not arise from the use of a covered auto, then the CGL Policy exclusion of injuries arising from the use would not have applied and the claim would have been covered – absent another exclusion. The two policies together created a range of coverage for Jolly Chef.

EMC has argued that the accident is covered by the CGL Policy, thereby excluding coverage by the Auto Policy. When language of coverage in a business auto policy is virtually identical to language of exclusion in a CGL policy, "[s]ome accidents would be covered by the auto policy, others by the CGL. A single accident could not be covered by both." *Travelers Indem. Co. v. Citgo Petroleum Corp.*, 166 F.3d 761, 769 (5th Cir. 1999).

In addition, even with a liberal reading of insurance policies, it is doubtful that dovetailed policy terms such as this should be interpreted a certain way if

the named insured were seeking coverage but differently if someone else such as those who are not the purchasers seek coverage. Had Jolly Chef been found liable in the state court suit, would this claim have been considered outside the coverage of the Auto Policy and within the coverage of the CGL Policy? If so, should the opposite result obtain here just because Bonilla is the claimant and is not an insured under the CGL Policy?

As a final general word about interpretation, we note that "many insurers actually intended the usages [of this policy term about "use" of an automobile] to be a device for coordinating coverage between two concurrent policies, one covering the insured's automobile and the other covering the insured's 'general' liability." COUCH § 119:26.

Our point in all of this is only that insurance policies are to be interpreted as written, with assumptions favoring coverage when conditions for those assumptions exist, and reliance upon the intent of the actual parties to the policies when necessary.

We now examine the coverage under the Auto Policy.

*B. The Auto Policy*

The first page of the Auto Policy is captioned "Commercial Auto Declarations – Business Auto Coverage." That same page states that Jolly Chef is the named insured, that the "form of business" is a corporation, and that the "description" of the business is "mobile catering." The policy, clearly, was not intended to apply to a motor vehicle used by individuals simply in their daily activities of traveling to and from work or school or otherwise. The policy was issued specifically for vehicles involved in a mobile catering business.

The entities who were insured included all who were "using with [Jolly Chef's] permission a covered auto." Since Bonilla leased Truck 219 from Jolly Chef, the parties agree there was coverage for Bonilla. The disagreement is

whether there was coverage for this accident. The accident must have been one "resulting from the ownership, maintenance or use of a covered auto."

The difficulty in the legal analysis arises from the need to determine the significance of the fact that Truck 219 was a vehicle designed for a special use. It had kitchen facilities built into it. Cleaning necessary from the use of that equipment set in motion the events resulting in the accident, and a pilot light that was part of the equipment was among the causes.

No definition of "use" appears in the Auto Policy. The district court held that coverage under the Auto Policy was not affected by the special use that Jolly Chef's mobile catering trucks served. Instead, the district court required the use of the vehicle to be one involving transportation. There is certainly caselaw from which to draw that conclusion. We turn now to Texas law.

Under Texas law, liability for "use" under this policy language requires that "a causal connection or relation . . . exist between the accident or injury and the use of the motor vehicle." *Lindsey*, 997 S.W.2d at 156. "The term 'use' is the general catchall of the insuring clause, designed and construed to include all proper uses of the vehicle not falling within other terms of definition such as ownership an[d] maintenance." *State Farm Mut. Auto. Ins. Co. v. Pan Am. Ins. Co.*, 437 S.W.2d 542, 545 (Tex. 1969). "[I]f a vehicle is only the locational setting for an injury, the injury does not arise out of any use of the vehicle." *Lindsey*, 997 S.W.2d at 156 (citing *LeLeaux v. Hamshire-Fannett Indep. Sch. Dist.*, 835 S.W.2d 49, 51-52 (Tex. 1992)).

For additional understanding of the language, we look again at the two insurance treatises that the *Lindsey* court relied upon. The Texas Supreme Court said that these two treatises derived a helpful test from numerous judicial opinions throughout the country:

> For an injury to fall within the "use" coverage of an automobile policy (1) the accident must have arisen out of the

7

No. 09-10476

inherent nature of the automobile, as such, (2) the accident must have arisen within the natural territorial limits of an automobile, and the actual use must not have terminated, (3) the automobile must not merely contribute to cause the condition which produces the injury, but must itself produce the injury.

*Id.* at 157 (quoting COUCH § 119:37; the court also cited 6B JOHN A. APPLEMAN, INSURANCE LAW AND PRACTICE § 4317 (Buckley ed. 1979) [hereinafter APPLEMAN]) (footnoted citations converted to this parenthetical).

In a way, this language begs our question, one the Texas Supreme Court did not need to answer. The *Lindsey* court said the inherent use was one "of the vehicle *qua* vehicle, rather than simply as an article of property." *Id.* at 156. The court cited a treatise concluding that this provision in "an automobile liability policy, means the use of a vehicle as such and does not include a use which is foreign to a vehicle's inherent purpose but to which a vehicle might conceivably be put." *Id.* at 156 n.12 (quoting APPLEMAN § 4316). The "inherent purpose" of a mobile catering truck certainly could be seen as including the use and maintenance of its kitchen facilities, though the inherent purpose of a usual vehicle would not include cooking.

Before trying to choose between generic and special purposes, we examine *Lindsey* further. In its opinion, the court held that a nine-year-old boy's act of climbing through a truck's sliding rear window to retrieve his coveralls constituted "use" of the vehicle as contemplated within an automobile policy. *Id.* at 154. While entering the truck, the boy accidentally touched a loaded shotgun that rested on a mount in the truck, causing the gun to discharge. *Id.* The shot struck Lindsey, who was sitting in a car parked next to the truck. *Id.*

The court applied the three factors we already noted and held that the injury arose out of the use of the truck. *Id.* at 158. The boy's entry may have been unorthodox but "it was not an unexpected or unnatural use of the vehicle, given his size, the fact that the vehicle was locked, and the nature of boys," and

8

it was his entry that caused the injury. *Id.* Though the third factor is particularly difficult, the court found that because the use of the truck was not unexpected or unnatural, the truck produced the injury. *Id.* at 159-60.

We need to choose between EMC's position that a vehicle *qua* vehicle refers to its simple, if broadly defined, transportation capabilities, and Bonilla and Molina's argument that coverage is for accidents arising from use of a mobile catering truck *qua* mobile catering truck.

Though we have been referred to many opinions from Texas and elsewhere, very few of them concern this specific issue. Almost none of them involve special business purposes of a vehicle. Molina argued that we could find coverage even if we view this explosion as resulting from the use of this vehicle simply as a means of transportation. That argument starts with the reality that Truck 219 was equipped with a kitchen. According to Dallas City Code provisions, all licensed mobile food units were required daily to return to the commissary to be cleaned and stocked for the next day's route. Dallas City Code § 17-8.2(g)(1), (h)(2)(F)(v). The full scope of Truck 219's purpose was to transport food and personnel and also to prepare and sell the food. Molina could not safely be transported with a greasy floor. Moreover, the food could not be prepared and sold if the truck were not clean and sanitary. *Id.* § 17-8.2(j)(2).

The problem with this argument, *i.e.*, that anyone riding in the truck would be unsafe unless the floor were clean, is that it still relies on the special purpose of the vehicle. That reliance does not change if we consider coverage for "maintenance." If this vehicle did not contain a mobile kitchen, this particular need to clean or this particular need to stand in the service area would not have existed. If the truck did not have a stove with a pilot light, this cause of the explosion would not have been present. The cleaning of this food preparation area does not undisputedly reveal use or maintenance of a vehicle *qua* vehicle, but it does show use or maintenance of the kitchen *qua* kitchen.

No. 09-10476

To repeat our analytical goal in this discussion, we are seeking to apply the first factor from *Lindsey* that "the accident must have arisen out of the inherent nature of the automobile, as such . . . ." *Lindsey*, 997 S.W.2d at 157. Each party argues that the answer does not turn on ambiguity. As we have discussed, the intent of the parties is relevant, but no one alleges there is a fact issue that requires us to remand.

We conclude that EMC's argument demands an unnatural reading of the policy language. There is nothing in the caselaw to suggest that Texas would interpret "use" under a business auto policy, in which the stated purpose of the vehicles being insured was for mobile catering, in a way that did not include the hazards that arise from maintaining the mobile catering equipment. Cleaning a mobile kitchen was not simply a speculative event that might conceivably occur, nor was the cleaning foreign to the vehicle's inherent purpose.

We acknowledge finding no published Texas caselaw so holding. We conclude, though, that the Texas Supreme Court if presented with this precise issue would take as a natural next step from *Lindsey* that this accident occurred from "the inherent nature" of this mobile catering truck. The vehicle intended is not some mystical, generic vehicle, but the one specifically insured by the parties to the policy. The special nature of this vehicle was not hidden or otherwise unknown – it literally was in black and white in the policy.

We also rely in part on one of the treatises seen as persuasive by the *Lindsey* court. In discussing business use provisions generally, the author states that the risks associated with the use of an automobile to be covered under an automobile policy may be defined in terms of the insured's business or some other reference. COUCH § 120:1. This is partly because of "the fact that many business uses present significantly different risks than personal use." *Id.* "Accordingly, automobile liability policies frequently provide for coverage of the

vehicle for business or commercial purposes only or for some specifically described business use." *Id*.

The policies at issue in this case defined the business as "mobile catering" and expressly covered mobile catering trucks which were equipped with a kitchen to prepare food. Though there was no express inclusion or exclusion of uses relating to the business purpose, such purpose would be the intent of the parties in contracting a "commercial automobile liability policy" for automobiles engaged in the mobile catering business.

We go no further than to hold, in what is a slight *Erie* guess but relying on substantial direction from the Texas courts, that a business vehicle policy covers the intended and identified uses of that business vehicle. The "injury-producing act" was cleaning the floor of the truck so that food could safely be prepared. The cleaning was a natural, expected, and necessary use of mobile catering Truck 219 and was covered by the Auto Policy.

We still need to consider two other factors mentioned in *Lindsey*. The next factor is whether the accident occurred within the natural territorial limits of the automobile. *Lindsey*, 997 S.W.2d at 157. Truck 219 was parked on Jolly Chef's lot at the time of the accident, and the injury occurred while Molina was inside of the truck. That factor is satisfied.

The third factor is whether the vehicle produced the injury. *Id*. The *Lindsey* court found this factor troublesome because it is difficult to decide what role a vehicle plays in producing an injury. *Id*. at 157-58.

EMC argues this factor is not met because nothing about the truck produced the injury. Rather, the injury was caused by the flammable substance ignited by the pilot light. EMC supports this argument with language from *Lindsey* that "a firearm discharge . . . does not arise out of the use of the vehicle merely because the gun rack is permanently attached. Rather, the purpose and circumstances of the injury-producing act are determinative." *Id*. at 163

11

No. 09-10476

There is a distinction between situations where the vehicle is only incidentally involved – it is the "mere situs" of an accident that could have occurred anywhere – and those "where the injury-producing act involved the use of a vehicle as a vehicle." *Tex. Farm Bureau Mut. Ins. Co. v. Sturrock*, 65 S.W.3d 763, 767 (Tex. App. – Beaumont 2002).

We are not persuaded by this reasoning. Most of the strength of EMC's argument is lost once we define "inherent nature" in the way that we have. This policy provided coverage for the uses of this mobile catering truck as just such a truck. The known and expected uses of this vehicle included activities relating to cooking. The cleaning and pouring of the substance on the floor and the resulting fire from the stove's pilot light produced the injury.

Each of the *Lindsey* factors is satisfied. There was coverage under the Auto Policy for injuries arising from use and maintenance of the vehicle. Because vehicle use is an exclusion under the CGL Policy, it likely would not have applied. Our holding gives a consistent reading to each policy.

*C. The Umbrella Policy*

The Commercial Umbrella Policy can apply in two instances. First, if there is coverage under the Auto Policy, there is coverage under the Umbrella Policy. Second, if there is no coverage under the Auto Policy, then there may be excess coverage of the retained limit under the Umbrella Policy provided the occurrence is "otherwise covered by" the Umbrella Policy.

There are substantial arguments made regarding this policy that understandably focus on the harder question of coverage if the Auto Policy does not apply. Because we have concluded that the Auto Policy provides coverage, the Umbrella Policy does as well.

Bonilla was using Truck 219 with Jolly Chef's permission. The Auto Policy provides coverage, and so does the Umbrella Policy.

No. 09-10476

*D. The Employee Injury Exclusion*

In the district court and now on appeal, EMC claimed that even if we find there was "use" of Truck 219 as required under the Auto Policy, coverage is still excluded under the Employee Injury Exclusion.

The referenced exclusion prevents coverage for bodily injury to "[a]n employee of the insured arising out of and in the course of employment by the insured." The "insured" was Bonilla, and the potential "employee" was Molina.

There is certainly Texas law to apply on the issue. "The test to determine whether a worker is an employee or an independent contractor is whether the employer has the right to control the progress, details, and methods of operations of the employee's work." *Thompson v. Travelers Indem. Co. of R.I.*, 789 S.W.2d 277, 278 (Tex. 1990) (citation omitted). "The employer must control not merely the end sought to be accomplished, but also the means and details of its accomplishment as well." *Id.* (citation omitted). EMC claims that if there is no coverage under the Auto Policy because of the Employee Injury Exclusion, there is likewise no coverage under the Umbrella Policy.

Though EMC raised this issue in the district court, the court did not rule on it because of its decision on issues regarding "use" of the vehicle. Issues that were raised but not resolved in district court should be considered first by that court. *KSLA-TV, Inc. v. Radio Corp. of Am.*, 693 F.2d 544, 546 (5th Cir. 1982).

We confine our analysis to the issues that were evaluated by the district court. This Employee Injury Exclusion can be considered by the district court should the issue again be pressed.

We REVERSE and REMAND for proceedings consistent with this opinion.